2025 IL App (4th) 230739

NO. 4-23-0739

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DAVYON D. DILLARD, | ) | No. 22CF74 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Harris concurred in the judgment and opinion.
Justice Doherty specially concurred, with opinion.

**OPINION**

¶ 1        In February 2022, the State charged defendant, Davyon D. Dillard, with one count

of aggravated vehicular hijacking, a Class X felony (720 ILCS 5/18-4(a)(4) (West 2022)), alleging

that on January 31, 2022, defendant stole Sharver Laney's vehicle after forcing her out of the

vehicle at gunpoint. In May 2023, a jury found defendant guilty, and he was later sentenced to 31

years in prison and 3 years of mandatory supervised release (MSR).

¶ 2        Defendant appeals, arguing (1) the State failed to prove him guilty beyond a

reasonable doubt; (2) the trial court abused its discretion by failing to instruct the jury on the lesser-

included offense of possession of a stolen vehicle; (3) defense counsel was ineffective for failing

to tender Illinois Pattern Jury Instructions, Criminal, No. 23.36a (4th ed. 2000) (hereinafter IPI

Criminal 4th No. 23.36a), titled "Inference From Possession Of Stolen Or Converted Vehicle";

(4) he was denied a fair trial by (a) the erroneous admission of hearsay, (b) improper remarks by the State during closing argument, and (c) the court sending prejudicial evidence to the jury during deliberations; (5) he was denied a fair sentencing hearing when the court improperly considered defendant's school disciplinary records; and (6) the court erred by sentencing him to an MSR term of 3 years.

¶ 3 Because we agree that defendant's 3-year MSR term was incorrect as a matter of law, we modify the trial court's judgment to correct the MSR term to 18 months. We otherwise affirm defendant's conviction and sentence as modified.

¶ 4 I. BACKGROUND

¶ 5 A. The Charges and Pretrial Proceedings

¶ 6 In February 2022, the State charged defendant with one count of aggravated vehicular hijacking, alleging that on January 31, 2022, defendant took Laney's vehicle from her at gunpoint.

¶ 7 B. The Jury Trial

¶ 8 In May 2023, the trial court conducted defendant's jury trial.

¶ 9 1. *The State's Case-in-Chief*

¶ 10 a. Sharver Laney

¶ 11 Sharver Laney testified that on January 31, 2022, at around 11 a.m., she texted Andre Wyatt to buy cannabis and he told her to go to 2211 Marquette Street, Peoria, Illinois. Laney and her friend, Alizajiah Robertson, then drove Laney's car, a Kia Sorento, to the address and parked the car on the street in front of the house. While they waited in the car, Laney was speaking on the phone with her mother, and Robertson was doing homework on her computer.

¶ 12 At some point, an individual came out of the house and entered the rear driver's

side of the car. Laney heard a "click" behind her, and the individual told Laney to hang up the phone. She turned around to see defendant pointing a brown gun at her head. Defendant told her to hang up the phone or her mother was going to hear her get shot. Laney complied, abruptly ending the call. Defendant then told her to get out of the car, saying, "I'll hit you with that gun again like I did before." Laney and Robertson exited the car, leaving the key fob needed to start the car in the center console. Defendant then drove off in Laney's car.

¶ 13　　　　　After defendant left, Laney dialed 911 on Robertson's phone and told a police officer that her car had been stolen. Shortly thereafter, three officers arrived, and Laney told one of the officers that the person who had stolen her car was called "Little Mark." She then got in the officer's squad car and was driven to the street where her car was found. When Laney arrived, she saw her car in the middle of the street with its doors open "[a]nd pretty much everything was like flipped around in the car, destroyed."

¶ 14　　　　　The officer asked Laney and Robertson if they could identify the person that stole the car. The officer then positioned the squad car so Laney and Robertson could see down the street toward other squad cars, which were about 50-60 feet away. From within the squad car, the officer asked her to identify who stole her car, explaining that they would "take the people out who they found one by one." When the first person was brought out of one the squad cars, Laney said, "That was him. *** That was the one who put the gun to my head and took the car." She said that his name was "Little Mark" but that she later found out his real name was "Day Day" or "Davyon." Laney had not known defendant for very long, which is why she did not know his name at the time. A second person was brought out of a different squad car, and Laney told the officer that he was Wyatt.

¶ 15　　　　　Laney testified that she told the officer that, when the car was stolen, she noticed

defendant wearing "blue orange" Jordan shoes. When asked whether she told the officers any other color, Laney responded that she had also told officers "black or white."

¶ 16    Laney further testified that, when her car was stolen, she had left her phone and wallet in the front center console of the car but, when she looked through her car after defendant was arrested, her smartphone, wallet, debit cards, and driver's license were all missing. She later recovered her wallet and cards at the police station but not the smartphone.

¶ 17    On cross-examination, Laney testified that on February 2, 2022, she called the police station to inquire about her cell phone. Defense counsel asked, "At that time, you told the officer who asked why you called him Little Mark you knew [defendant] as Day Day and that when the gun was first put to your head you thought it was [his] little brother who goes by Little Mark, is that correct?" Laney said, "Yes." Counsel asked, "But now you think it's not [defendant's] little brother it's—" Laney interjected, saying, "I knew who it was." She continued, "I knew who it was. It's just the name I got mixed up." Defense counsel asked her if the man holding the gun had gloves on. Laney said that she could not remember but did remember that he had on a ski mask.

¶ 18                              b. Alizajiah Robertson

¶ 19    Robertson testified that the morning of January 31, 2022, she was with Laney, working on schoolwork. The following exchange between the State and Robertson occurred:

"Q. What were the two of you doing that morning?

A. We was—I was doing my schoolwork. I was going to school at the time, and we had needed a blunt. So, we had went down there.

Q. You're going to have to keep your voice up.

A. We went down on Marquette Street to pick it up, but the boy that was

there, he wasn't there that was texting us.

Q. Who were you going to pick up the blunt from?

A. We was supposed to pick it up from Dre Wyatt, but he wasn't there. He was at the store. But he said that Davyon was there and that we would get it from him.

Q. So when you got, you went to Marquette Street I understand?

***

A. Yes, sir."

¶ 20 After the girls arrived, defendant came out of the house and told them "he needed a scale or something" and then reentered the house. When he came back out of the house a second time, he got in the back of the car. Robertson heard a "clicking" sound from the back of the car but assumed it was a tray that was on the floor in the back seat. She realized the clicking sound was a gun when defendant told Laney to hang up the phone and pointed the gun at Laney's head. The gun was brown. Laney asked defendant, "[A]re you serious?" Defendant replied, "[I]f you [do not] want your momma to hear you die over the phone, hang up the phone." Laney complied. Defendant demanded Laney give him the phone, and she handed it to him. Laney and Robertson exited the car, and defendant drove away.

¶ 21 Robertson testified that the pair stood on the sidewalk in front of the house and Robertson lent Laney her phone to call the police. Robertson then entered the house to tell defendant's sister what had happened and "get some information." She testified as follows:

"I talked to [defendant's mother's] youngest daughter. I told her what was his name and everything. Her daughter said 'Mark.' But we don't know like his nickname. I don't really know him like that."

Robertson testified that she knew defendant only because "his mother used to talk to [Robertson's] grandmother."

¶ 22        When Robertson left the house, she saw that a police officer had parked in front of the house and was standing on the sidewalk talking to Laney, who was crying. Laney was explaining what had happened and appeared angry. The officer asked Robertson and Laney to go with him in his squad car to identify the suspects who had been arrested with Laney's car. They rode in the back of the officer's squad car to the location where the police had arrested the suspects. From inside the squad car, they first identified defendant and then Wyatt as each was brought out of a separate police car. Robertson was certain that defendant was the person who had stolen Laney's car at gunpoint. She testified, "We knew he took the car. It was no mask. No nothing. Like straight face. We knew he took the car. He was the only person in the car. You know what I'm sayin'?"

¶ 23                        c. Law Enforcement Witnesses

¶ 24        Multiple police officers testified regarding their investigation into the events of January 31, 2022, as follows:

¶ 25        Shannon Parnell, a police officer with the Peoria Police Department, testified that on January 31, 2022, he was dispatched to 2211 Marquette Street, regarding an armed vehicular hijacking. Once at the address, he met with Laney, who was standing on the sidewalk visibly upset. She told him what had happened and that a gun was used for the hijacking. Parnell radioed that information to other officers. Eventually, Robertson joined the conversation, and he obtained further information from her.

¶ 26        Multiple Peoria police officers responded to the dispatch for the stolen vehicle, which they quickly located. However, the vehicle refused to stop when the police attempted to pull

it over, and the officers ended up pursuing the vehicle in a high-speed chase in their squad cars for over seven minutes. Eventually, an officer interdicted the stolen vehicle in his car. Defendant and Wyatt abandoned the car and fled on foot.

¶ 27 Defendant and Wyatt ran onto the porch of 924 South Warren Street and then were discovered by officers hiding in the cellar of 922 South Warren Street. The pair were told to exit the cellar through the outside cellar door in the backyard. They complied and were then arrested. Officers searched defendant and found the keys to Laney's car. Officers also searched Wyatt and found Laney's wallet and credit cards.

¶ 28 Officers also searched the area for a gun. They did not find anything in the cellar where defendant and Wyatt had been found, but officers did find a brown 9-millimeter handgun under the porch of 924 South Warren Street. Officer Scott Bowers, who found the gun, testified that he did not believe the gun had been under the porch for very long because there was no debris or dirt on the gun. There was a loaded magazine in the gun containing 10 rounds.

¶ 29 As part of Bowers's investigation, he swabbed the handgrips for DNA analysis and examined the gun, magazine, and ammunition for latent fingerprints. Only one fingerprint was recovered, which forensic analysis revealed matched the known fingerprint of Wyatt.

¶ 30 At 11:40 a.m., Officer Parnell drove Laney and Robertson to the location where defendant and Wyatt were in custody, to conduct a show-up. Parnell explained the show-up as follows:

> "The females were in the backseat of my car. They were able to see out, but the suspects could not see the victims sitting in my car. And then once they obtained a visual identification, made a positive identification, then they were—and I believe the suspects were removed from the scene and the females that were in my car

- 7 -

remained at the scene."

¶ 31 After their arrest, defendant and Wyatt were brought to the police department and placed in separate interview rooms for questioning. Detective Brian Terry testified about what defendant had said to him during the interview. He asked defendant why he took the car, and defendant told Terry that "they [(Laney and Robertson)] were at his home. He needed to go and get his cell phone repaired and so he took the car." According to Terry, defendant said that he did not stop the car for the police because, "as he was driving, he saw the police and didn't think anything of it. Then, when an unmarked police car tried to, as he claimed, hit them, he said he just drove off."

¶ 32 Terry also attempted to question Wyatt, but Wyatt did not answer any questions or make any statements. Terry later recovered videos and images from Wyatt's cell phone showing Wyatt holding a brown handgun that looked like the gun found under the porch.

¶ 33 2. *Defendant's Evidence*

¶ 34 Defendant testified that on the morning of January 31, 2022, he was at his mother's house at 2211 Marquette Street with Wyatt, although his mother was not home. At 8 a.m., defendant left the house to run some errands. When he returned to his mother's house, he saw Laney and Robertson sitting on the porch. He did not see their vehicle. He headed toward the house but then decided to walk toward his friend's house, which was two blocks away. As he was walking on Antoinette Street, Wyatt pulled up in a car beside him and asked defendant to drive. Defendant recognized the car as Laney's and thought that she had lent it to Wyatt. Wyatt said that he needed to get some money, and defendant told Wyatt that he needed to get his phone fixed, so defendant agreed to drive. Wyatt then slid over to the passenger seat, and defendant got into the driver's seat of the car.

¶ 35        Defendant drove the car to "the Johnson store," about two minutes away, to get his phone fixed, but when defendant gave the store clerk his phone, the clerk gave it back to him. Defendant then called his mother to let her know he was headed home. Defendant got back into the car and headed toward a location where he could get money for Wyatt. On the way, he saw a police car, which began driving in his direction. Wyatt said, "[G]o, go, go," so defendant drove away, and a chase ensued. At that point, defendant did not think the vehicle was stolen; instead, he thought Wyatt's insistence that he drive away from the police meant Wyatt had cannabis on him.

¶ 36                    3. *Closing Arguments*

¶ 37        During closing arguments, the State commented as follows:

"Now, most of use hopefully have not had to live through that experience [that Laney did]. It's hard to replicate in the dry environment, sterile environment in a courtroom over a year later. [Laney] came in [here]. She told [you] what happened. And she is talking to her mother. And [defendant] wants her off the phone.

So, what does this young man do when she doesn't get out of the car? He tells her, basically, he was going to kill her, and her mother would have to listen to that on the phone. That's the person that is sitting behind me. That's the person who went on the witness stand today and told you a story, a lie, who made an attempt to divert the attention away from him.

Ms. Robertson sitting there on her computer doing schoolwork when this all started said what happened also. The same thing. They knew the defendant. But I submit the defendant is the type of person that it doesn't make any difference.

Didn't make any difference that day.

How could someone do this? How could someone put a gun to another person's head and threaten to kill them. How could that happen?

I don't know. It's not a burden that I have to present evidence as to why, but I can tell you this: He's the type of person, unfortunately, at his young age— and he is an adult. He's responsible for his behavior. But he's the type of person that thought nothing of driving over eight minutes, that video that was presented to you from the viewpoint of Officer Bruess'[s] squad car directly behind the defendant, the vehicle the defendant was driving.

Why was he driving like that? Because a friend Andre Wyatt said to go, go, go? No. No. Because of what he had just done."

¶ 38 Defense counsel argued to the jury that there was a reasonable doubt about who hijacked the car, pointing out that Laney had named defendant's younger brother originally. He also argued that (1) the distance between the girls and defendant during the show-up, (2) the inconsistencies in their testimony, and (3) Wyatt's fingerprints being the only ones on the handgun's magazine left a reasonable doubt about who hijacked the car.

¶ 39 In rebuttal, the State argued as follows:

"Counsel wants you to believe, he's talking about these alternate theories of identification and in some cases, I've heard that certainly. It's a popular defense argument. But not in this case. These girls knew the defendant. They knew Andre Wyatt.

\* \* \*

You all saw the girls testify. You saw the defendant testify. It is for you to

- 10 -

determine who was credible, who was telling the truth. You saw them both testify, and you saw the defendant testify. And counsel wants you to believe, well, credibility is not really, it's not between credibility. Of course it is.

And I keep going back—counsel keeps claiming that, oh, well, he's not the one who did it. My client is not the one who did it. They were confused. They got the wrong person.

There's no evidence of that. None other than in defense counsel's mind. I understand. He's representing his client. But there was no doubt in the girls' mind who threatened to kill Sharver Laney and let her mother hear her die on the phone."

¶ 40                    4. *Jury Instructions and Deliberations*

¶ 41          During the instruction conference, defense counsel requested that the trial court give three lesser-included jury instructions relating to the offense of possession of a stolen or converted vehicle—specifically, IPI Criminal 4th Nos. 23.35, 23.35A, and 23.36. Counsel argued that the lesser-included instructions should be given because the offense of possession of a stolen motor vehicle was a lesser-included offense of aggravated vehicular hijacking. The State objected, arguing that the allegations in the present case were that defendant stole the vehicle by force, which was incompatible with simple possession of a stolen motor vehicle.

¶ 42          The trial court agreed with the State and did not give those instructions, instead giving only the instructions related to the offense of aggravated vehicular hijacking.

¶ 43          During the conference, the trial court also addressed what evidence would be sent back to the jury, stating, "[L]et's address the exhibits that go back. You've each examined those, and I don't see any that should not go back except for the fingerprint cards." The State asked to have all the exhibits it presented besides the fingerprint cards sent back to the jury. Defense counsel

did not object. Among the evidence the court sent into the jury room for the jury's consideration, the court sent the handgun, which had been disabled, and bullets found in the magazine.

¶ 44     Later, when instructing the jury about the exhibits that would be sent back to the jury room during deliberations, the trial court remarked that it was "reluctant usually to provide weapons that also have bullets to them in the same sleeve with you" but it was "going to do that here."

¶ 45     The jury found defendant guilty of aggravated vehicular hijacking.

¶ 46                    C. The Posttrial Motion and Sentencing Hearings

¶ 47     In June 2023, the trial court conducted hearings on defendant's posttrial motion and sentencing. At the time of the sentencing hearing, defendant was 20 years old.

¶ 48     At the beginning of the hearing, defense counsel made an oral motion for new trial, which was then drafted in writing in the courtroom, arguing that defendant was denied a fair trial because the trial court (1) sustained several of the State's objections to admissible testimony, (2) overruled several defense objections to inadmissible testimony, and (3) refused defendant's request that the jury be instructed on the "lesser included offense of Possession of a Stolen Motor Vehicle." The court denied the motion.

¶ 49     After addressing defendant's motion, the trial court proceeded to the sentencing portion of the hearing. The court said it had considered the presentence investigation report (PSI) and then asked, "Are there any additions, corrections, modifications to be offered by the State to the [PSI]?" Both parties answered, "No." The court then asked if either party had evidence to present in aggravation or mitigation. Defense counsel responded, "No sir. *** Just that which is contained in the PSI."

¶ 50     The PSI contained, among other things, defendant's school records from Peoria

- 12 -

Public Schools, which defendant had authorized the school district to release on May 15, 2023, for the purpose of "Pre-Sentence Investigation.". Those school records contained a 45-page list of disciplinary offenses defendant had committed throughout his time in the Peoria Public Schools, from 2011 through 2019, including numerous instances of fighting, missing class, issuing threats, and other violent and threatening conduct. Regarding those disciplinary offenses at school, defendant reported in the PSI that "he had been suspended a few times for fighting and having a 'blow up.' "

¶ 51　　　　The PSI also contained information about defendant's record of delinquency and status prior to his arrest in January 2022. The PSI showed that defendant was adjudicated delinquent (1) in July 2013, for residential burglary, a Class 1 felony; (2) in January 2020, for three counts of unlawful possession of a stolen vehicle, a Class 2 felony, which he committed on three separate occasions in September 2019, October 2019, and December 2019; and (3) in June 2020, for burglary, a Class 2 felony. In addition, the PSI showed that defendant was issued multiple tickets while in jail for, among other things, (1) insubordination, (2) flooding his cell, and (3) fighting.

¶ 52　　　　The State noted that defendant's sentencing range was 21 to 45 years in prison and argued that defendant should be sentenced to a "substantial period of time" in prison, greater than the minimum 21-year prison term. Pointing to defendant's (1) school discipline records, (2) history of juvenile adjudications, and (3) adult criminal history, the State argued that defendant had shown a lack of ability to conform his behavior to societal norms, emphasizing in particular his "abysmal educational background."

¶ 53　　　　Defense counsel argued for the minimum sentence, arguing that in 20 years he will be a different person and will have grown out of his history of poor behavior. Further, counsel

argued that defendant grew up in public housing that counsel described as a "war zone." He also asserted that defendant, as a child, was impoverished, moved around frequently, and lacked stability in his life, which resulted in substance abuse at an early age.

¶ 54       In allocution defendant stated, among other things, "I know my juvenile records that—all of this, my schooling and everything make it look like I'm a terrible person. I'm just a bad person." He explained that he always had trouble in school and said, "I'm not a bad kid. Yes. I made bad decisions in life because I didn't have the knowledge of right in the room that I was learning." He concluded by apologizing to his mother and his siblings.

¶ 55       The trial court began its ruling by commenting favorably about defendant's statement in allocution, explaining that his statement "took some years off [the sentence]." The court then stated it had considered the PSI, the evidence, the arguments, the statement in allocution, and the statutory factors in aggravation and mitigation. The court emphasized the danger defendant posed to the community when he fled from the police and the brazen conduct of hijacking the car of an individual who knew him in broad daylight. The court also read a few excerpts from the school disciplinary records in the PSI and noted the number of pages, saying, "[O]ne of the things [the Peoria schools] have done that has been on the money for 20, 30 years is memorialize and categorize discipline events for students."

¶ 56       Ultimately, the trial court sentenced defendant to 31 years in prison and 3 years of mandatory supervised release (MSR).

¶ 57       This appeal followed.

¶ 58                                    II. ANALYSIS

¶ 59       Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court abused its discretion by failing to instruct the jury on the lesser-

included offense of possession of a stolen vehicle; (3) defense counsel was ineffective for failing to tender IPI Criminal 4th No. 23.36a, titled "Inference From Possession Of Stolen Or Converted Vehicle"; (4) he was denied a fair trial by (a) the erroneous admission of hearsay, (b) improper remarks by the State during closing argument, and (c) the court sending prejudicial evidence to the jury during deliberations; (5) he was denied a fair sentencing hearing when the court improperly considered defendant's school disciplinary records; and (6) the court erred by sentencing him to a MSR term of 3 years.

¶ 60    Because we agree that defendant's three-year term of MSR was incorrect as a matter of law, we modify the trial court's judgment to correct the MSR term to 18 months. We otherwise affirm defendant's conviction and sentence as modified.

¶ 61    A. The Evidence Was Sufficient for the Jury To Find Defendant Guilty of

Aggravated Vehicular Hijacking

¶ 62    Defendant argues that the State's evidence identifying him as the hijacker was insufficient to prove him guilty beyond a reasonable doubt because the State relied solely on the eyewitness testimony of Laney and Robertson. Defendant characterizes their identification of defendant as "the product of an unreliable show-up procedure," rendering their in-court identifications also unreliable. In addition, defendant argues that the State's theory of the case was improbable, given the evidence. We disagree.

¶ 63    1. *The Applicable Law and the Standard of Review*

¶ 64    To obtain a valid conviction, the State must prove beyond a reasonable doubt (1) that a crime has been committed and (2) the identity of the person who committed the offense. *People v. Lara*, 2012 IL 112370, ¶ 17.

¶ 65    On appeal, a reviewing court will not retry the defendant and instead asks

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When applying this standard, we neither reweigh the evidence nor judge witness credibility; instead, we defer to the factfinder's credibility determinations. See *People v. Smith*, 185 Ill. 2d 532, 542 (1999). We will not set aside a criminal conviction based on insufficient proof "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Beverly*, 278 Ill. App. 3d 794, 798, (1996). The testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 35.

¶ 66        Regarding the reliability of eyewitness testimony, we assess whether, drawing all reasonable inferences in the State's favor, a factfinder could have accepted the testimony as true beyond a reasonable doubt. *In re T.B.*, 2020 IL App (1st) 191041, ¶ 44. In so doing we consider the totality of the evidence and consider the following five factors: "(1) the witness's opportunity to view the suspect, (2) the witness's degree of attention, (3) the accuracy of any prior descriptions provided, (4) the witness's level of certainty at the time of the identification procedure, and (5) the length of time between the crime and the identification." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

¶ 67        A person commits the offense of aggravated vehicular hijacking "when he *** knowingly takes a motor vehicle from the person or the immediate presence of another *** by threatening the imminent use of force" (720 ILCS 5/18-3(a) (West 2022)) and "he *** carries on or about his *** person or is otherwise armed with a firearm" (*id.* § 18-4(a)(4)).

¶ 68                                2. *This Case*

- 16 -

¶ 69    Looking at the evidence in the light most favorable to the State and applying the five *Biggers* factors for witness identification, we conclude that the jury could have easily accepted beyond a reasonable doubt Laney and Robertson's identification of defendant as the hijacker.

¶ 70    Although the third factor slightly favors defendant because the witnesses gave conflicting testimony about the name of the hijacker—referring to the hijacker as "Little Mark"—the other four factors strongly favor the State.

¶ 71    Regarding the first two factors, the witnesses had ample opportunity to view the hijacker and were highly attentive. Laney and Robertson testified that (1) defendant spoke with them while they were in the car and issued orders that they both followed, (2) they both saw defendant place a gun against Laney's head as she turned around *to look at the hijacker*, (3) Robertson saw defendant come out of the house twice and then enter the car, and (4) the hijacking occurred in the middle of the day. See *People v. Herrett*, 137 Ill. 2d 195, 200 (1990) (stating the identification was reliable, despite dim lighting conditions from two feet away after only "a few seconds" of observation). We note that Laney testified, contrary to Robertson, that defendant was wearing a ski mask at the time of the hijacking. However, Laney's identification of defendant need not be based solely on his facial features, and this discrepancy does not show that Laney was inattentive or had a little opportunity to view defendant.

¶ 72    Regarding the fourth factor, the witnesses' level of certainty at the time of the identification procedure, no evidence suggests that the girls were uncertain about the identity of the hijacker. At the show-up, both girls quickly identified the first suspect brought out of the police car, who was defendant, as the hijacker. Whether they were correct about defendant's name is of no consequence to their identification.

¶ 73    Regarding the fifth factor, the time between the hijacking and the show-up was only

40 minutes.

¶ 74       In addition, although having two witnesses is not dipositive of a reliable identification, "there is no denying that a multiple-witness identification case is stronger than a single-identification one." *In re T.B.*, 2020 IL App (1st) 191041, ¶ 52. Ultimately, Laney and Robertson's identifications each individually satisfied the five-factor test.

¶ 75       Regardless of the "the inherent suggestiveness of any show-up procedure" (*id.* ¶ 56), nothing here suggests that the girls' identification of defendant was influenced by the procedure or was so shaky and unreliable as to warrant reversal. As we already discussed, the show-up occurred shortly after the hijacking, and both girls viewed the hijacker in close proximity, face to face in the middle of the day.

¶ 76       We also reject defendant's argument that the State's theory of the case was improbable. In essence, defendant's contention is that Wyatt was the hijacker and defendant merely got caught up in the crime. He bases this argument largely on (1) Laney and Robertson's referring to defendant as "Little Mark" before they learned his actual name, (2) the evidence implying that the brown gun was Wyatt's gun, and (3) the police search of Wyatt revealing he had Laney's personal belongings on him. However, none of this evidence even comes close to suggesting that defendant's identity as the hijacker was "improbable."

¶ 77       The evidence is clear that the only two people who could have been the hijacker were defendant and Wyatt. As we discussed earlier, defendant was reliably identified by Laney and Robertson, notwithstanding their referring to him as "Little Mark" and their conflicting testimony about whether he was wearing a ski mask. They both knew Wyatt and had little difficulty identifying him at the show-up by name. Given their familiarity with Wyatt, it is very unlikely that they would mistake Wyatt for defendant when they were able to observe defendant up close in the

car and hear him speak.

¶ 78    Further, defendant admitted to Detective Terry after he was arrested that he had taken the car, saying, "[T]hey were at his home. He needed to go and get his cell phone repaired and so he took the car." In addition, defendant's identity as the hijacker was supported by his fleeing from numerous police squad cars in a high-speed car chase through a residential neighborhood. See *People v. Davis*, 2023 IL App (1st) 220231, ¶ 42 ("[A] defendant's flight from police also indicates consciousness of guilt.").

¶ 79    Ultimately, we conclude that the evidence was clearly sufficient to prove defendant guilty beyond a reasonable doubt of aggravated vehicular hijacking.

¶ 80                              B. Jury Instructions

¶ 81    Next, defendant argues that (1) the trial court erred by failing to give a lesser-included-offense instruction and (2) trial counsel was ineffective for failing to request IPI Criminal 4th No. 23.36a. We disagree.

¶ 82                    1. *The Applicable Law and the Standard of Review*

¶ 83                         a. The Standards of Review

¶ 84    "[T]he proper standard of review of a trial court's refusal to give a requested jury instruction is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 69.

¶ 85    "Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *People v. Haynes*, 2024 IL 129795, ¶ 23.

¶ 86                       b. Ineffective Assistance of Counsel

¶ 87    A claim of ineffective assistance of counsel is governed by the familiar two-prong standard outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that trial counsel's legal representation (1) "fell below an objective standard of

- 19 -

reasonableness under prevailing professional norms, such that he or she was not functioning as the counsel guaranteed by the sixth amendment" and (2) prejudiced the defendant "by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors." *Haynes*, 2024 IL 129795, ¶ 23. "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness." *Id.*

¶ 88    c. The Two-Pronged Test for Determining Whether a Defendant Is Entitled to a
Jury Instruction for an Uncharged Lesser-Included Offense

¶ 89    For a defendant to be entitled to a jury instruction for an uncharged lesser-included offense, (1) the charging instrument must contain factual allegations that provide a broad foundation or main outline of the lesser offense—in other words, the uncharged offense must be a lesser-included offense of the charged offense—and (2) "an examination of the evidence [must] reveal[ ] that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense." *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 38. A defendant has the burden of persuasion to show he meets each prong of that test. If he fails to meet any prong of that test, he is not entitled to a jury instruction for an uncharged lesser-included offense.

¶ 90        i. *The First Prong*

¶ 91    Regarding the first prong, whether a particular offense is "lesser included" is determined on a case-by-case basis using the factual description of the charged offense in the indictment. *People v. Kolton*, 219 Ill. 2d 353, 367 (2006). "The indictment need not explicitly state all of the elements of the lesser offense as long as any missing element[s] can be reasonably inferred from the indictment allegations." *People v. Miller*, 238 Ill. 2d 161, 166-67 (2010).

¶ 92        ii. *The Second Prong*

¶ 93       The following three cases are illustrative of the second prong of the test for determining whether a defendant is entitled to a jury instruction for an uncharged lesser-included offense. Each case shows that the evidence must both be believable and negate some element of the greater charged offense while still satisfying the elements of the lesser uncharged offense.

¶ 94       In *Ammons*, 2021 IL App (3d) 150743, ¶ 40, the Third District held that it was not conceivable that the jury would rationally acquit the defendant of aggravated battery of a police officer but find him guilty of resisting arrest when (1) it was undisputed that defendant had bitten the arresting officer's finger during the course of arrest and knew the bite victim was a police officer and (2) caselaw showed that biting a police officer while resisting arrest constituted aggravated battery. *Id.*

¶ 95       In *People v. Manning*, 2020 IL App (2d) 180042, ¶ 17, the defendant was found guilty of residential burglary. On appeal, he argued that the jury should have been given the jury instruction for criminal trespass because the evidence showed he had abandoned his intent to steal from the house prior to entering. *Id.* The Second District disagreed, noting as follows:

> "If the jury believed defendant's vague and sometimes contradictory statements on the recordings, he either (1) abandoned his plan and never entered the house or (2) broke into the house intending to steal money but changed his mind. In the former case, he would not be guilty of any offense. In the latter case, he would be guilty of residential burglary because the statute requires only an entry with the *intent* to commit a theft, not an actual theft. ***
>
> Defendant seems to suggest that he went to the house with the intent to steal, changed his mind about stealing, but proceeded to enter the house anyway. The inference that defendant suffered a sudden crisis of conscience about stealing but

- 21 -

decided to enter the house for some other reason is simply not rational. A lesser included offense instruction is required only where the jury could *rationally* find the defendant guilty of the lesser offense and not guilty of the greater offense." (Emphases in original.) *Id.* ¶¶ 17-18.

¶ 96　　　In *People v. Austin*, 216 Ill. App. 3d 913, 916 (1991), the defendant was found guilty of residential burglary and on appeal argued the jury should have been instructed on criminal trespass to a residence. The evidence showed that the defendant had entered the house at 2:30 a.m., the occupant awoke to find him with one hand near her mouth and the other moving to turn out the light, and he was wearing rubber gloves on a hot July night. *Id.* at 917. The defendant raised only the defense of misidentification. *Id.* Ultimately, the Second District held that the evidence showed that the defendant was either guilty of residential burglary or was not guilty of any crime because there was no other reason for his being in the house at that hour. *Id.* at 917-18.

¶ 97　　　*Austin* also shows that the defense of misidentification cannot meet the second prong because defendant cannot be rationally found guilty of a crime he did not commit. *Id.* Likewise, proposed lesser included instructions based on unreasonable interpretations of the evidence (*Manning*, 2020 IL App (2d) 180042, ¶¶ 17-18) and a lack of evidence disputing any element of the charged offense (*Ammons*, 2021 IL App (3d) 150743, ¶ 40) fail to meet the second prong of the test.

¶ 98　　　We reiterate the supreme court's observation in *People v. Davis*, 213 Ill. 2d 459, 478-79 (2004), that "while a defendant may assert theories to try to mitigate or rebut responsibility for *charged* offenses, the defendant cannot argue responsibility for less serious, but unrelated, offenses which were not charged. *** A criminal does not have the right to choose his or her prosecution or punishment." (Emphasis added and internal quotation marks omitted.)

¶ 99                                  2. *This Case*

¶ 100                           a. Defendant Fails To Meet the First Prong

¶ 101        Here, defendant asked the trial court to instruct the jury on the lesser-included offense of possession of a stolen or converted vehicle. See 625 ILCS 5/4-103(a)(1) (West 2022). He argues that the jury could have reasonably found him guilty of that offense and not guilty of aggravated vehicular hijacking because "it is impossible to commit aggravated vehicular hijacking without necessarily committing possession of a stolen or converted vehicle." We disagree.

¶ 102        The information alleged the following:

> "[Defendant] knowingly took a motor vehicle, being a Kia Sorento from the person or immediate presence of Sharver Laney at 2211 W. Marquette, Peoria, Illinois, by the use of force or by threatening the imminent use of force and he carried on or about his person or was otherwise armed with a firearm, being a handgun."

¶ 103        The charging instrument in this case accuses defendant of taking Laney's car from her at gunpoint. If defendant argued that he was entitled to a lesser-included instruction because he took the car, but not at gunpoint, then a lesser-included instruction would be proper. However, that is not what defendant argues. Instead, defendant argues that the lesser-included instruction should be given because after Wyatt took possession of the car at gunpoint, defendant *later* possessed the stolen vehicle. However, his later possession of the stolen vehicle is *not* the charged offense.

¶ 104        The charged offense is the initial taking of the vehicle at gunpoint. Defendant's later possession of the stolen vehicle, after Wyatt had taken it at gunpoint, would be a *separate*, uncharged offense. Accordingly, under the facts of this case, the later possession of the stolen

- 23 -

vehicle, premised upon defendant's claim that Wyatt hijacked the vehicle at gunpoint, is *not* a lesser-included offense of the charged offense of aggravated vehicular hijacking. The trial court correctly declined to instruct the jury on the lesser-included offense of possession of a stolen motor vehicle.

¶ 105                 b. Defendant Fails To Meet the Second Prong

¶ 106         Here, the evidence and defendant's arguments centered entirely on the defense claim of misidentification by Laney and Robertson; it was undisputed that *someone* stole the car at gunpoint in front of defendant's mother's house. Because, on this evidence, the hijacker had to be either defendant or someone else, any lesser included offense of the charged hijacking would also need to have been committed by defendant or that same "someone else." We conclude that no reasonable jury could believe that defendant merely took the car from Laney without having also threatened her at gunpoint; accordingly, a lesser included instruction would not have been proper. See *Ammons*, 2021 IL App (3d) 150743, ¶ 38 ("A defendant is entitled to a lesser included offense instruction only if an examination of the evidence reveals that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense."); see also *Manning*, 2020 IL App (2d) 180042, ¶ 13 ("[W]here the evidence shows that a defendant is either guilty of the greater offense or not guilty of any offense, no additional instruction is necessary."); *Austin*, 216 Ill. App. 3d at 917 ("The only defense arising from the evidence and from defense counsel's arguments was misidentification. Defendant was either guilty of the offenses as charged or not guilty. Thus, the trial court properly refused defendant's instructions on the lesser-included offense.").

¶ 107         c. Trial Counsel's Failure To Tender IPI Criminal 4th No. 23.36a

¶ 108         Defendant also argues that trial counsel was ineffective for failing to tender IPI

Criminal 4th No. 23.36a, which provides, in part, "Under the law, you may infer that a person exercising exclusive unexplained possession over [(a stolen or converted vehicle) (an essential part of a stolen or converted vehicle)] has knowledge that such [(vehicle) (essential part)] is stolen or converted."

¶ 109    He bases this argument on his claim that the circumstantial evidence suggested that defendant was not the hijacker. However, because this instruction should be given only to accompany the lesser-included instruction of possession of a stolen motor vehicle, which, as we just discussed (*supra* ¶ 104), the trial court correctly declined to give, had defense counsel tendered IPI Criminal 4th No. 23.36a, the court would have appropriately rejected it as well. As a result, defendant cannot show that counsel's performance was deficient for failing to request a jury instruction that the court would have rejected.

¶ 110                          C. Defendant Received a Fair Trial

¶ 111    Next, defendant argues that he was denied a fair trial by (1) the trial court's allowing Robertson to testify to hearsay evidence of Wyatt's text messages to her, which placed defendant at the scene of the hijacking, (2) the prosecutor's statements during closing argument about the "type of person" defendant was and the prosecutor's suggestion that defense counsel was a "liar," and (3) the court sending the gun used in the hijacking to the jury during its deliberations. We disagree.

¶ 112                  1. *The Trial Court Did Not Admit Hearsay Evidence*

¶ 113                   a. The Applicable Law and the Standard of Review

¶ 114    "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible." *People v. Price*, 2021 IL App (4th) 190043, ¶ 137. "A statement is not barred by the prohibition against hearsay if the statement is not offered for its truth

but for some other reason, such as to show the effect on the listener's mind or to show why the listener undertook subsequent actions." *Id.*

¶ 115        Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion. *People v. Thornton*, 2024 IL App (4th) 220798, ¶ 51.

¶ 116                                    b. This Case

¶ 117        Defendant contends that the following exchange between the State and Robertson constituted the admission of inadmissible hearsay:

> "Q. What were the two of you doing that morning?
>
> A. We was—I was doing my schoolwork. I was going to school at the time, and we had needed a blunt. So, we had went down there.
>
> Q. You're going to have to keep your voice up.
>
> A. We went down on Marquette Street to pick it up, but the boy that was there, he wasn't there that was texting us.
>
> Q. Who were you going to pick up the blunt from?
>
> A. We was supposed to pick it up from Dre Wyatt, but he wasn't there. He was at the store. But he said that [defendant] was there and that we would get it from [defendant].
>
> Q. So when you got, you went to Marquette Street I understand?
>
> * * *
>
> A. Yes, sir."

¶ 118        Specifically, defendant argues that Wyatt's statement placing defendant at the Marquette Street residence was improperly admitted for its truth. Defendant acknowledges that he

- 26 -

did not preserve the issue by objecting to the statement at trial but contends that we may review the issue under the plain-error doctrine.

¶ 119         We decline to do so because Wyatt's statement was not hearsay. Instead, that statement was relevant and admissible to show the statement's effect on the listeners. That statement explained why Laney and Robertson were parked on Marquette Street, despite Robertson's testimony that Wyatt, the person they originally contacted, was not available to provide cannabis. See *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 47 ("[A]n out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible." (Internal quotation marks omitted.)).

¶ 120         *2. The State's Closing Arguments Were Not Plain Error*

¶ 121         Because defendant did not object to the State's comments during closing argument, he has forfeited for review the argument that the comments deprived him of a fair trial. *People v. Johnson*, 2024 IL 130191, ¶ 40 (requiring a defendant to object to and raise the alleged error in a posttrial motion to avoid forfeiture). However, we may excuse defendant's forfeiture and review the issue if it amounted to plain error. *Id.* ¶ 42.

¶ 122         a. The Applicable Law and Standard of Review

¶ 123         The plain-error rule allows reviewing courts to review a forfeited error if the error falls under one of the following two prongs:

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness

of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 21.

¶ 124 The usual first step in a plain-error analysis is to determine whether a clear and obvious error occurred. *Johnson*, 2024 IL 130191, ¶ 44. "However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel [citation], the first step of plain-error analysis is merely a matter of convention," and we may begin the analysis in any order. (Internal quotation marks omitted.) *People v. Bowens*, 407 Ill. App. 3d 1094, 1108 (2011). That is true because, if there is no error, then there can be no plain error. *People v. Tolliver*, 2021 IL App (1st) 190129, ¶ 36. Likewise, even if a clear or obvious error occurred, if either (1) the evidence was not closely balanced or (2) the alleged error was not so serious that it affected the fairness of the trial or challenged the integrity of the judicial process, then a defendant's claim fails.

¶ 125        b. This Case

¶ 126      i. *The State's Comments Were Not Clear and Obvious Error*

¶ 127 We first examine defendant's contentions under the standard for evaluating prosecutorial closing arguments.

¶ 128 "[P]rosecutors are generally accorded wide latitude in the content of their closing arguments." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *Id.* On review we consider the closing argument as a whole rather than focusing on selected phrases or remarks. *Id.*

¶ 129 Here, defendant first argues that the following statements made by the State during its closing arguments were improper because they "invited the jury to make character inferences about [him] that had nothing to do with the issues presented at trial":

> (1) "Defendant's the person who went on the witness stand today and told you a story, a lie, who made an attempt to divert attention away from him."

(2) "Ms. Robertson sitting there on her computer doing schoolwork when this all started said what happened also. The same thing. [Laney and Robertson] knew the defendant. But I submit the defendant is the type of person that it doesn't make any difference."

(3) "How could someone do this? How could someone put a gun to another person's head and threaten to kill them? How could that happen? I don't know. It's not a burden that I have to present evidence on as to why, but I can tell you this: He's the type of person, unfortunately, at his young age—and he is an adult. He's responsible for his behavior. But he's the type of person that thought nothing of driving over eight minutes, that video that was presented to you from the viewpoint of Officer Bruess's squad car directly behind the defendant, the vehicle the defendant was driving."

¶ 130   We conclude the above statements were not improper. The State's commenting on defendant's "type" was not an invitation for the jury to consider defendant's character generally but instead a fair comment on the brazenness of the specific crime he committed in this case. The evidence showed that (1) the hijacking occurred in broad daylight in front of defendant's mother's house, (2) the victims had some familiarity with defendant, and (3) defendant led police officers on a high-speed chase through a residential neighborhood. Accordingly, the prosecutor's comment about defendant's "type" was not improper.

¶ 131   Next, defendant argues that the State made an improper argument when it said that defense counsel's theory of misidentification was a "popular defense argument." In addition, defendant argues that the State made an improper argument by (1) suggesting that "defense counsel fabricated a defense theory" and (2) implying that "counsel's job requires him to lie on

behalf of [defendant]" when the prosecutor stated the following:

> "And I keep going back—Counsel keeps claiming that, oh, well, he's not the one who did it. My client is not the one who did it. They were confused. They got the wrong person. There's no evidence of that. None other than in defense counsel's mind. I understand. He's representing his client."

¶ 132    In support of his argument, defendant cites three cases: *People v. Emerson*, 97 Ill. 2d 487, 497 (1983) ("Unless based on some evidence, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper."); *People v. Rodriguez*, 134 Ill. App. 3d 582, 591 (1985) (holding it was improper for the State to tell the jury that it was defense's counsel's job to " 'try to get his client off' "); and *People v. Holloway*, 119 Ill. App. 3d 1014, 1021 (1983) (concluding that the State's labeling a defense theory as "the oldest trick in the book" was improper).

¶ 133    In essence, defendant argues that the State improperly characterized defense counsel as dishonest. However, these statements, when viewed in context of the entire argument, were not improper. See *People v. Williams*, 2022 IL App (2d) 200455, ¶ 128 ("In determining whether comments made during closing argument were improper, we review the closing argument in its entirety and view remarks in context."). The *complete* statements were as follows:

> "When they saw [defendant] a short while later, they said that's the one who had the gun to my head. Counsel wants you to believe, he's talking about these alternate theories of identification and in some cases, I've heard that certainly. It's a popular defense argument. But not in this case. These girls knew the defendant. They knew Andre Wyatt.

And I keep going back—counsel keeps claiming that, oh, well, he's not the one who did it. My client is not the one who did it. They were confused. They got the wrong person. There's no evidence of that. None other than in defense counsel's mind. I understand he is representing his client. But there was no doubt in the girls' mind who threatened to kill Sharver Laney and let her mother hear her die on the phone."

¶ 134 With this additional context, the statements at issue amount to little more than rhetorical filler in an argument focused primarily on Laney and Robertson's identifications of defendant as the hijacker. What these statements do not do, however, is seriously place at issue defense counsel's credibility or character or the legitimacy of his trial strategy, unlike the cases upon which defendant relies (*supra* ¶ 132).

¶ 135 Accordingly, because we conclude that the prosecutor's statements were not improper, we will not forgive defendant's procedural forfeiture under the plain-error doctrine.

¶ 136  ii. *Neither Prong of the Plain-Error Doctrine Is Met Here*

¶ 137 Moreover, even if we assumed for argument's sake that the statements constituted clear and obvious error, we would still honor defendant's forfeiture because (1) the evidence was not closely balanced and (2) the alleged error was not so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.

¶ 138 First, "[t]o determine whether the evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58

(quoting *People v. Sebby*, 2017 IL 119445, ¶ 53). Typically, the evidence is closely balanced when "the outcome of this case turned on how the finder of fact resolved a 'contest of credibility.' " *Sebby*, 2017 IL 119445, ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A "contest of credibility" exists when (1) both sides presented a plausible version of events and (2) there is no extrinsic evidence to corroborate or contradict either version. *Id.* ¶¶ 60-63.

¶ 139 Here, the evidence did not come down to a contest of credibility, nor was the evidence particularly close. As we discussed *supra* ¶¶ 79, the evidence was more than sufficient for the jury to find defendant guilty beyond a reasonable doubt and far from being closely balanced. Put simply, given the girls' testimony, the circumstantial evidence, and the internal inconsistency of defendant's testimony, the evidence was compelling that defendant had hijacked Laney's car. Accordingly, the prosecutor's comments, even if we assumed they were improper, cannot be first-prong plain error.

¶ 140 Next, as the supreme court recently explained, "Obtaining review under the second prong of the plain error rule is indeed a high hurdle, as the second prong is only implemented in those exceptional circumstances where, despite the absence of objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process." (Internal quotation marks omitted.) *Johnson*, 2024 IL 130191, ¶ 54. The supreme court has equated second-prong plain error to structural error, which are errors that are not subject to harmless-error review. *Id.* ¶ 91 (citing *People v. Jackson*, 2022 IL 127256, ¶ 49). However, "comments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *Williams*, 2022 IL 126918, ¶ 56.

¶ 141 Here, we easily conclude that the prosecutor's comments referring to defendant's

"type" and defense counsel's arguments, even if improper, were far from being so serious that they affected the fundamental fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 142 Accordingly, because the prosecutor's comments during closing argument did not amount to first- or second-prong plain error, we honor defendant's forfeiture of his claim that the comments denied him a fair trial.

¶ 143 3. *The Trial Court Did Not Abuse Its Discretion by Sending the Weapon*
*Used in the Offense to the Jury Room During Deliberations*

¶ 144 Defendant argues that the trial court erred by sending the gun back to the jury during its deliberations because the gun was not relevant to any material issue and emphasized the dangerousness of the offense. Defendant also argues that the court's statement that it was "reluctant to provide weapons that also have bullets in the same sleeve *** with you, but I am going to do that here" implied that the defendant's case was in some way unique, prejudicing him. We disagree.

¶ 145 " 'It is well-established that whether evidentiary items *** should be taken to the jury room rests within the discretion of the trial judge, whose decision will not be disturbed unless there was an abuse of discretion to the prejudice of the defendant.' " *People v. Hollahan*, 2020 IL 125091, ¶ 11 (quoting *People v. Hudson*, 157 Ill. 2d 401, 439 (1993)).

¶ 146 Defendant completely fails to demonstrate how he suffered any prejudice because the jury received the gun during the jury's deliberations; accordingly, we reject his argument. We conclude the trial court's decision did not constitute an abuse of discretion. We note that the dangerousness of the gun was already apparent, given Robertson's testimony that defendant threatened to kill Laney while she was on the phone with her mother.

¶ 147 That the trial court expressed reservations about sending the gun to the jury during its deliberations is of no significance at all. We particularly reject defendant's claim that the court's remarks (1) implied that defendant's case was in some way unique and (2) prejudiced him. We deem this claim groundless speculation.

¶ 148 Ultimately, because none of defendant's claims for how he was denied a fair trial constituted error—namely, (1) the trial court's admission of Wyatt's statement, (2) the State's comments during closing argument, and (3) the court sending the gun back to the jury— defendant's claims fail.

¶ 149 D. Defendant's Prison Sentence Was Not an Abuse of Discretion

¶ 150 1. *The Trial Court Did Not Err by Considering Evidence of Defendant's Education Records as Part of the PSI*

¶ 151 a. The Applicable Law and Standard of Review

¶ 152 Every criminal defendant has the right to be sentenced based on only proper sentencing factors. *People v. Larson*, 2022 IL App (3d) 190482, ¶ 32. When fashioning a defendant's sentence, a trial court should consider "(1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34. A court should also consider the statutory factors in aggravation and mitigation listed in the Unified Code of Corrections (Code). See 730 ILCS 5/5-5-3.2 (West 2022); *id.* § 5-5-3.1; *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 49.

¶ 153 "A reviewing court gives substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character,

mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. "[A] reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper." *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56.

¶ 154 We review whether the trial court relied on an improper sentencing factor *de novo*. *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 15. "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *Larson*, 2022 IL App (3d) 190482, ¶ 29.

¶ 155                                  b. This Case

¶ 156 Defendant contends that his school disciplinary records should not have been included in the PSI or considered by the trial court. Defendant concedes that he did not preserve the issue for appeal but argues that we may review the issue as plain error. See *Sebby*, 2017 IL 119445, ¶ 48 (allowing forfeited issues to be considered on appeal). However, the plain-error doctrine does not apply when defense counsel has affirmatively acquiesced to actions taken by the trial court. *People v. Houston*, 2024 IL App (3d) 210324, ¶ 22. When defense counsel has affirmatively acquiesced, "a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack." *Bowens*, 407 Ill. App. 3d at 1101.

¶ 157 Further, this court has held that "[t]he trial court may rely on all of the information in the unobjected to PSI to the extent it believes it is relevant and reliable." (Emphasis omitted.) *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 56. Counsel's explicit refusal to object to the information in the PSI when asked by the trial court is not a mere oversight but essentially amounts to a stipulation to the accuracy of the PSI's content in its entirety. *Id.* ¶ 58.

¶ 158 Here, not only did defense counsel acquiesce to the disciplinary records, but so did

defendant personally. Defendant himself had multiple opportunities to object to the inclusion of those records in the PSI or to their consideration by the trial court, but he did not.

¶ 159　　　　At sentencing, the first thing the trial court said was that it had received and reviewed the PSI. The court then asked whether either party had any objections or modifications to the PSI, to which defense counsel answered, "No." Further, defendant himself (1) signed a release form in May 2023 for the school district to release those records for his PSI, (2) referred during his PSI interview to his records of fighting at school, and (3) referred to the disciplinary records in his statement in allocution when discussing his childhood struggles in school.

¶ 160　　　　Both explicitly and implicitly, defendant acquiesced and even encouraged the trial court to consider the disciplinary records at the sentencing hearing. See *People v. Hutt*, 2022 IL App (4th) 190142, ¶ 42, *rev'd in part on other grounds by People v. Hutt*, 2023 IL 128170) ("Silently acquiescing to an error results in a forfeiture, but actively ratifying the error results in estoppel. [Citation.] If, in the trial court, defendant invited an error, he now is estopped from complaining of the error.").

¶ 161　　　　Nonetheless, defendant argues that the trial court erred by considering the records in any way, citing Justice McDade's dissenting opinion in *People v. Ferguson*, 2021 IL App (3d) 200041, ¶ 35 ("[T]he trial court erred by giving these school disciplinary records *any* weight." (Emphasis in original.)). However, the majority in that case rejected that notion. Like the majority in *Ferguson*, we conclude that the trial court's consideration of defendant's school disciplinary record was not improper.

¶ 162　　　　Further, we note that the sentence defendant received was well within the statutory sentencing range for a Class X felony with a 15-year enhancement for possession of a firearm. That sentencing range was 21 to 45 years in prison. 730 ILCS 5/5-4.5-25 (West 2022); 720 ILCS

5/18-4(b) (West 2022). Because the trial court's 31-year sentence was squarely within the statutory range, we presume it was proper. See *Musgrave*, 2019 IL App (4th) 170106, ¶ 56.

¶ 163    Nothing in the record overcomes that presumption, and defendant's school disciplinary records were far from the sole factor considered by the trial court in formulating its sentence. The court explicitly stated that it had considered the statutory factors, the evidence presented, and the arguments of the parties. The court even found defendant's statement in allocution to be compelling and mitigating, but the court also noted that (1) his prior criminal history, (2) the danger he caused the community by leading police officers on a high-speed chase through a residential area, and (3) his pointing a gun at Laney's head were strong factors in aggravation.

¶ 164        c. Defendant's Citation of Scientific Materials Not in the Record

¶ 165    We note that, in support of defendant's argument on appeal challenging the trial court's consideration of his school disciplinary records, defendant cites the following materials:

(1) Illinois State Board of Education Racial Disproportionality Data, https://www.isbe.net/_layouts/Download.aspx?SourceUrl=/Documents/Exclusion -Expulsion-Data.xlsx (last visited Feb. 10, 2025) (providing statistics for school discipline in Peoria School District 150 by racial identity) [https://perma.cc/JMQ3-HN4D];

(2) Russel J. Skiba *et al*., *African American Disproportionality in School Discipline: The Divide Between Best Evidence and Legal Remedy*, 54 N.Y. L. Sch. L. Rev. 1071, 1087 (2009/2010) ("For over thirty years, in national, state, district, and building level data, the documentation of disciplinary overrepresentation for African American students has been highly consistent.");

(3) Nicole Tuchinda, *The Imperative for Trauma-Responsive Special Education*, 95 N.Y.U. L. Rev. 766, 801 (June 2020) ("[T]rauma can cause children to be triggered at school by non-threatening reminders of a traumatic event, causing them to experience overwhelming, unpleasant emotions and to behave unexpectedly, aggressively, impulsively, or disruptively. Trauma can thus manifest in fighting, disrespectful language, opposition and defiance to instruction, leaving the classroom or school, or other behaviors that schools traditionally interpret as signs of bad character, moral failings, laziness, or lack of willpower.");

(4) Ctr. for L., Brain & Behav., Mass. Gen. Hosp., *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers* at 17-21 (Jan. 27, 2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (concluding that brain maturation continues beyond adolescence, extending until around age 25) [https://perma.cc/YB59-V36M];

(5) Ze'ev Hochberg and Melvin Konner, Emerging Adulthood, a Pre-adult Life-History Stage, Frontiers in Endocrinology (Jan. 2020) (same).

¶ 166 Based on these articles, defendant asserts that his sentence is an abuse of discretion because (1) he "has a lot of trauma stemming from his childhood," (2) his brain was not fully matured, (3) the school disciplinary records were unreliable, and (4) "[t]he extensive nature of [his] school records can be explained, in part, because he attended school in Peoria School District 150 as a black student." Because none of these materials or arguments were presented to the trial court, we emphatically reject any consideration of the materials defendant cites for the first time on appeal. See *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 130 ("Based upon [*People v. Cline*, 2022 IL 126383], [*People v. House*, 2021 IL 125124], and [*In re R.M.*, 2022 IL App (4th)

210426], we conclude it is impermissible for a reviewing court to take judicial notice of material that was not considered by the trial court when a defendant, as here, is challenging the trial court's exercise of discretion.").

¶ 167                              2. *Defendant's MSR Term Was Erroneous*

¶ 168          Last, defendant argues that he was erroneously sentenced to 3 years of MSR when the correct term was 18 months. The State concedes that the MSR term was erroneous, explaining that the correct MSR term for a Class X felony at the time was 18 months and defendant could have been given 3 years for aggravated vehicular hijacking only if the conduct resulted in great bodily harm. See 730 ILCS 5/5-8-1(d)(1.5) (West 2022); *id.* § 3-6-3(a)(2)(iii).

¶ 169          We accept the State's concession and modify defendant's sentence to reflect the correct MSR term of 18 months pursuant to Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967). See *People v. Gulley*, 383 Ill. App. 3d 727, 734 (2008).

¶ 170                              III. CONCLUSION

¶ 171          For the reasons stated, we affirm the trial court's judgment as modified consistent with this opinion.

¶ 172          Affirmed as modified.

¶ 173          JUSTICE DOHERTY, specially concurring:

¶ 174          I concur with the majority opinion in almost every respect, including the conclusion that defendant acquiesced in the trial court's consideration of his school disciplinary records at sentencing. Where I differ with the majority is that I believe defendant's acquiescence makes it unnecessary for us to further opine on the merits of that issue.

¶ 175          I harbor reservations about the correctness of the majority decision in *Ferguson*. That case held that a defendant's school disciplinary records may be received at sentencing

pursuant to section 5-5-3.2(a)(3) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(a)(3) (West 2022)), which lists as a proper aggravating factor that "the defendant has a history of prior delinquency or criminal activity." While it is conceivable that there could be overlap between the two, it seems a stretch that "delinquency" as used in the statute can be equated with school disciplinary actions. "It is a general rule that words grouped in a list should be given related meaning ***." *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 22. Here, the only word appearing in the statute next to "delinquency" is "criminal activity," giving every indication that the conduct being referenced is an adjudication of delinquency under the Juvenile Court Act of 1987 (705 ILCS 405/5-101 *et seq.* (West 2022)).

¶ 176          That is not to say whether school disciplinary records could be considered at a sentencing hearing, either in aggravation or mitigation, under some other statutory provision. I simply feel that we have no need to opine on the correctness of the broad statement made in *Ferguson* because of defendant's acquiescence to the trial court's consideration of the school records in this case. I join in the majority opinion in all other respects.

*People v. Dillard*, 2025 IL App (4th) 230739

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 22-CF-74; the Hon. Kevin W. Lyons, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Daniel N. Arkes, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |