NOTICE

Decision filed 06/09/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240253-U

NO. 5-24-0253

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 22-CF-313 |
| | ) | |
| ISAAC HILL, | ) | Honorable |
| | ) | Steven M.J. Bost, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Cates and Justice Moore* concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence are affirmed where defendant failed to establish first-prong plain error as the evidence was not so closely balanced that the errors alone threatened to tip the scales of justice.

¶ 2    Defendant, Isaac Hill, was convicted of first degree murder following a bench trial in the circuit court of Jackson County and sentenced to 50 years in prison followed by 3 years of mandatory supervised release (MSR). Defendant appeals, arguing that the State's improper cross-examination of defense expert witness, Dr. Shiping Bao, resulted in reversible plain error. For the following reasons, we affirm.

---

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

¶ 3                                    I. Background

¶ 4     On June 23, 2022, the State charged defendant by information with two counts of endangering the life or health of a child (720 ILCS 5/12C-5(a)(1) (West 2020)), alleging that defendant knowingly caused or permitted the malnourishment and dehydration of the victim, I.H., defendant's three year-old daughter (count II), causing the proximate death of I.H. (count I). The State subsequently filed a second amended information charging defendant with, *inter alia*, two counts of first degree murder (*id.* § 9-1(a)(1), (2)), alleging that defendant, with the intent to kill or do great boldly harm to I.H., struck I.H. causing her death (count I), and defendant, without lawful justification, struck I.H., knowing such acts created a strong probability of death or great bodily harm, thereby causing I.H.'s death (count II).

¶ 5     On August 21, 2023, the circuit court held defendant's three-day bench trial. The testimony elicited at trial demonstrated that defendant, I.H.'s father, brought I.H. to the emergency room (ER) at Memorial Hospital of Carbondale (Memorial) on June 22, 2022. Nurse Jeremy Oakley, a Memorial ER supervisor, testified that "[a]s soon as [he] visualized the child, [he] knew that [I.H.] needed immediate resuscitation." According to Nurse Oakley, I.H. appeared "extremely lethargic," describing her arms and legs as "floppy" and displaying no reaction whatsoever while in defendant's arms. Nurse Oakley testified that he immediately took I.H. to a resuscitation room. At that time, I.H. was unresponsive, her pupils were affixed, and she was "not behaving like a normal child." Nurse Oakley testified that, after learning her age, it was his opinion that I.H. did not look like a three-year-old. Nurse Oakley continued to describe I.H.'s physical state, stating that "she had no muscle tone. She had no subcutaneous fat." The palms of I.H.'s hands, feet, and gums were white, not pale, and upon squeezing her skin, no blood returned to her extremities. When Nurse Oakley inquired into I.H.'s state, defendant reported that the family had COVID, including I.H.,

which required the family to feed I.H. with a syringe for several days. On cross-examination, Nurse Oakley confirmed that he and his team performed cardiopulmonary resuscitation (CPR) on I.H. for 40 minutes.

¶ 6    Dr. Scott Denton, an expert forensic pathologist who performed I.H.'s autopsy, testified that I.H.'s overall condition at the time of her death was "basically in a state of starvation, very thin, emaciated. *** She only weighed 21 pounds for a three-year-old and her height was 33 inches, which was mark[ ]ed[ly] small for a three-year-old." Based on the growth chart for height and weight through the Centers for Disease Control and Prevention, I.H. was in the zero percentile for weight, which meant that "out of a group of a thousand children, there are no children that weigh less than her, and .2% percentile for height. She is essentially the bottom, bottom rung." According to Dr. Denton, I.H.'s physical presentation was indicative of starvation and a lack of nourishment.

¶ 7    Dr. Denton continued to testify that I.H.'s physical examination showed "little tissue to support her ribs," a distended abdomen, and "tented" skin, which meant that the skin did not go back down immediately when pinched, signaling dehydration. Dr. Denton also testified that I.H. had hair loss, called alopecia, as a result of a lack of vitamins, calories, and nutrition. I.H. also had a prolapsed rectum caused by malnourishment and dehydration-induced constipation. I.H. had no rib fractures but numerous circular scars on her mid-forehead, right and left hands, left thumb, lower leg, upper back, right wrist, forearm, spine, and upper shoulder blade. Dr. Denton testified that the circular scars were consistent with something that "would leave circular thermal or heat type burns," consistent with a cigarette burn. Dr. Denton also testified that I.H. had excess dehydration of her lips and no urine in her catheter, which demonstrated that her kidneys were not functioning and had "shut down basically."

3

¶ 8     Dr. Denton's examination also revealed I.H. had "a massive amount of bleeding" in her abdomen with "stringy blood," which meant the abdomen was "clotting blood so it's not recent." Dr. Denton clarified that the clotted blood in I.H.'s abdomen was older blood that had been clotting for several hours to several days and "not from CPR." In addition, I.H.'s liver and intestines were pale and bloodless, and she had no fat tissue in her belly area, which Dr. Denton testified "goes with starvation and chronic malnutrition." I.H. had almost no blood in her blood vessels, which demonstrated chronic internal bleeding. Dr. Denton explained that a tear in the underside of I.H.'s liver caused her to bleed to death internally, stating that the torn bruise on the underside of the liver was "consistent with an injury or basically the liver is pushed against the spine and the back of the liver tears, and it's not consistent with CPR." Dr. Denton continued to state that if a liver tears from CPR "it's related to compression of the chest," which would occur higher up on the liver. Specific to I.H., she had a tear on the underside of the liver closest to the spine, which, according to Dr. Denton, "doesn't happen in CPR, if you are going to get a tear in the liver it's always in the front and it's always up high, and that's usually only adults." Dr. Denton continued to testify that "children really don't get liver tears from CPR. They might get rib fractures, but even that's rare, but children don't get fatal liver injuries or tears from CPR." Instead, Dr. Denton testified that children experience fatal liver lacerations from blunt trauma to the abdomen.

¶ 9     Dr. Denton also testified that there was no evidence of pneumonia, bronchitis, myocarditis, or a viral respiratory infection in I.H.'s lungs. Dr. Denton testified that the pneumonia virus presents as "very firm and hard" and "a dark red," due to inflammation. Specific to I.H., her right lung was pink with no firm areas. Although her left lung was redder and had a small area of firmness, Dr. Denton opined that I.H., "at most," had old pneumonia at some point in the past. Dr. Denton also testified there was no visual or microscopic bronchitis in I.H.'s lungs. Moreover, Dr.

4

Denton testified that I.H. did not have myocarditis, or an infection of the heart. Dr. Denton also stated that there was no indication COVID played a part in I.H.'s death, or that she had sickle cell disease. Dr. Denton opined that I.H.'s cause of death resulted from blood in her abdomen, due to a liver laceration and contusion from blunt trauma to her abdomen that occurred within days of her death. Dr. Denton also opined that several factors, including starvation, dehydration, and neglect, contributed to her internal bleeding.

¶ 10    On cross-examination, Dr. Denton stated that it was not medically reasonable that a liver laceration would be from CPR. He continued to state, however, that he also knew that a liver laceration "in that area, up above from CPR will not cause death, that's not known or documented."

¶ 11    Dr. Kasey Nelson, an ER physician with 20 years of experience, the medical director of Memorial ER, and an expert in emergency medicine, testified that I.H. arrived at the ER "[c]ritically ill" and unresponsive to verbal or tactile stimuli. Medical professionals performed CPR after discovering I.H. had a low heart rate of 40. Dr. Nelson testified that he spoke with defendant, who informed him that I.H. was three years old. Dr. Nelson "recall[ed] this [conversation] specifically because [he] was extremely surprised," stating that I.H. appeared "the size, the height *** [of a] one-year-old." Dr. Nelson "had to ask multiple times to clarify that [I.H.] was indeed three years old." Dr. Nelson testified that I.H.'s extremities were white, which meant her body was vasoconstricted, explaining that her body was "cutting off circulation to her extremities to try to keep any blood flow to the heart and to the brain and that was quite noticeable." Dr. Nelson also noted an abnormal blood draw—one he had never seen before—in which I.H.'s blood was a "clear serum" with no red blood cells detected in the blood sample. To highlight how abnormal I.H.'s blood presented, Dr. Nelson explained that, even if a patient bled out from their femoral artery, the "blood is going to look normal" because the "body has not had time to

5

compensate for that loss of blood, that takes hours." Thus, Dr. Nelson opined that the presence of clear serum demonstrated that I.H.'s body had "compensate[d] for that loss of blood, that takes hours, hours, for that compensation to occur." As such, in his opinion, I.H. had suffered from internal bleeding, which had "occurred well before [she] arrived to the ER."

¶ 12    Dr. Nelson testified that defendant initially informed him that I.H. had not been feeling well for a few days from COVID. Several minutes later, defendant stated that I.H. had not felt well for a week and required feedings through a syringe for several days. Several minutes later, defendant then stated that I.H. had not felt well for three or four weeks. Prior to placing a catheter, Dr. Nelson noticed that I.H.'s diaper was not wet. After placing the catheter, he noticed that I.H. had no urine in her bladder, which signaled to him that she was severely dehydrated.

¶ 13    Dr. Nelson next testified that he reviewed Dr. Bao's report in preparation for trial, stating that he disagreed with Dr. Bao's opinion that CPR could cause a posterior liver laceration. Dr. Nelson stated that "a literature search *** is very clear that when you typically get say liver lacerations from CPR, it's typically going to be an adult. It's much rarer in pediatric patients" because the bones of young children are pliable and bend. Dr. Nelson stated that injury from CPR occurred "less than one percent of the time." Dr. Nelson stated "that the literature *** firmly establishes that CPR is safe, that the likelihood of you causing any significant solid organ injury from CPR is miniscule." Dr. Nelson, who performed CPR an "enumerable number of times in [his] career," had never seen a child die from CPR or an injury related to CPR "outside of broken ribs or broken sternum." Although a puncture could occur, according to Dr. Nelson, the puncture would occur on the anterior or the outside portion of the liver, not the posterior aspect of the liver close to the spine. Specific to I.H., Dr. Nelson testified that an injury to the posterior aspect of the liver "just does not correlate with injury from CPR ***." Dr. Nelson also testified that a lacerated liver

6

due to CPR would not cause I.H. to appear critically ill at the hospital. Rather, in his opinion, it would have taken a "minimum of hours" for her physical state to become critically ill from a CPR-related liver laceration. Dr. Nelson confirmed that I.H.'s medical records had no mention of sickle cell disease.

¶ 14    On cross-examination, Dr. Nelson, again, testified that he disagreed with Dr. Bao's opinion that CPR caused I.H.'s posterior liver laceration, stating that, based on literature in a "preeminent pediatric paper," CPR-related injuries occurred in .06% of cases. Dr. Nelson confirmed that I.H. tested positive for COVID; however, he testified that a person could test positive for up to 90 days. On redirect examination, Dr. Nelson confirmed that I.H. could have had COVID in the last three months. Dr. Nelson testified he had never seen a child in I.H.'s condition as a result of COVID.

¶ 15    Next, the State called Rebecca Grammer, an investigator with the Illinois Department of Children and Family Services, who testified that she started her investigation following I.H.'s death on June 22, 2022. On June 23, 2022, police officers removed four children from defendant's home, including an infant, four-year-old twins, and a six-year-old child. In testifying to her observations of the children, Grammer stated that defendant's youngest child, an infant, seemed healthy, whereas the four-year-old twins and the six-year-old child were similar in size. According to Grammer, the older children could not stand on their own or crawl onto the seat of the car. She testified that the children were not verbal, unable to make eye contact, and not potty trained. When Grammer provided food to the children, she noticed that the children could not pick up food or feed themselves but would "smash it and squeeze it into little pieces and then lick it off of their hands."

¶ 16    Next, Katrina Hill, I.H.'s mother and defendant's wife, testified to the following. Katrina acknowledged that she was testifying for the State under a proffered agreement. She also admitted

7

that she pled guilty to child endangerment of I.H. by permitting I.H. to be malnourished. Katrina testified that she had 17 children, with 14 children fathered by defendant. Katrina testified that in June 2022 she slept in the back bedroom with her youngest child, and I.H. slept in the front room with defendant. When discussing the weekend before I.H.'s death, Katrina testified that she heard I.H. crying. When Katrina inquired with defendant, he "just said that [I.H.] was crying and that he had her, that he was—you know, he got her." Katrina explained that I.H. was crying because she wanted to be in the bedroom with Katrina. The next day, Katrina saw I.H. sitting on the couch. Katrina did not see I.H. get off the couch. When asked if I.H. stayed on the couch until Wednesday, June 22, 2022, Katrina asked the State for a moment before stating that I.H. was acting differently, stating that I.H. usually followed her around the house. Katrina confirmed that I.H. "didn't get up [from the couch] that day when [Katrina] went to the bathroom. *** She just didn't get off the couch, so [she] thought that maybe [defendant], you know, told [I.H.], you know, to sit there." Katrina testified that she first noticed something seriously wrong with I.H. on Wednesday, June 22, 2022, when she "walked around the couch and [she] *** looked at [I.H.] and it was like something wasn't right to [her]." After I.H. was unresponsive, Katrina called defendant, and he came home to take I.H. to the hospital. Katrina testified that she did not see defendant hit I.H. "in a bad like—like a punch or nothing like that, no." She did, however, see defendant "pop[ ] [I.H.] on the butt before."

¶ 17    On cross-examination, Katrina stated that she told investigators that defendant took care of I.H. in the middle of the night. She testified that she never saw defendant "physically try to harm [her] daughter. [She] never seen [*sic*] [defendant] punch [I.H.]" Sometime before I.H.'s death, Katrina made frequent visits to Cairo, Illinois, following her grandmother's death. During that time, defendant stayed at home with the children, including I.H.

8

¶ 18    On redirect examination, Katrina testified that I.H.'s nickname was "Peanut." The following colloquy took place:

"Q. *** When you were speaking to police at the proffer the second time did you say she was—[defendant] said, 'She was screaming in my ear and I whooped her?'

A. He said she got up and she was screaming, yes.

Q. And he said, 'I whooped her?'

A. He said he popped—yeah, he—and put her back on the couch, made her lay down.'"

¶ 19    On recross examination, Katrina stated that she could not recall what night the above exchange between her and defendant took place. She stated that defendant "didn't do it to physically—he wasn't physically harming her." Katrina stated that she did not see what defendant did to I.H., "so [she] can't say what he did, [she] wasn't out there."

¶ 20    The State called two neighbors, Matthew Sronkoski and Robert Esselburn, who both testified that they never saw children outside defendant's home, despite a playset in the backyard. The State also called Justin Haney, a case agent with the Illinois State Police, who testified that he reviewed digital evidence seized from defendant's home following I.H.'s death. Agent Haney testified to a Facebook message conversation between defendant and Katrina. Specifically, on June 18, 2022, defendant messaged Katrina at 12:47:46 a.m., stating: " 'Bout to blast peanut butter.' " Katrina responded at 12:48:20 a.m., " ' I hear her.' " Defendant responded, " 'Yep.' " Following the close of the State's evidence, defense counsel made an oral motion for a directed verdict, which the trial court denied.

¶ 21    Before calling witnesses, defense counsel introduced, and the trial court admitted into evidence, text messages between defendant and Katrina on June 21, 2022. The State made no

9

objection. On June 21, 2022, at 9:37 p.m., defendant texted Katrina, "Wat you wanta do with peanut hospital or wait[?]" Katrina responded, "Idk hell I know I don't like this shit." Defendant responded with a thumbs up emoji and shortly thereafter stated: "She drinking water and juice."

¶ 22    The defense called Dr. Shiping Bao, a medical doctor and expert in the field of forensic pathology. Dr. Bao testified that he did not perform I.H.'s autopsy but reviewed the autopsy report and photographs, toxicology report, and tissue slides, as well as the police report and medical records. Dr. Bao confirmed that the defense hired him as a defense expert for case review. Dr. Bao opined that I.H. was not dehydrated but overhydrated because I.H. had vitreous fluid behind her cornea. Dr. Bao testified that a visual examination of I.H. could not determine hydration, overhydration, or dehydration. According to Dr. Bao, I.H. had a low amount of sodium, chloride, creatinine, and urea nitrogen in her body, which meant she had too much fluid in her body, even though he confirmed that she was small. To explain his opinion regarding overhydration, Dr. Bao testified that he did not think "the parents did anything wrong. The baby probably dr[a]nk too much water or in the hospital they g[a]ve her too much fluid." Dr. Bao also testified that it was "unethical for *** [a] physician[ ] to accuse anybody of starvation" and neglect of a child. Dr. Bao also opined that I.H. had sickle cell disease and undiagnosed congenital problems which caused her to appear emaciated. Dr. Bao determined that I.H. had sickle cell anemia, provided her "spleen [wa]s less than half the weight of the kidney," a condition called splenatrophy, and the fact that I.H. was black. Dr. Bao testified that the administration of a simple genetic test, which he did not perform himself, could have been used to diagnose I.H. with sickle cell disease.

¶ 23    Dr. Bao reviewed the autopsy photographs and Dr. Denton's description of I.H.'s liver laceration, testifying that he "often *** [saw] liver laceration after CPR. It's common, especially when young people die of other disease." Dr. Bao opined that the CPR administered to I.H. caused

10

her liver laceration, resulting in her death, because the CPR pinched the posterior liver against the spine, causing a laceration. When asked whether there were different measures to take for administrating CPR to infants, Dr. Bao responded: "I don't know. I don't know any difference, but in my training many years ago I think for the youth and small baby you use two fingers instead of use the palm." Dr. Bao continued to testify that the ribs protect the liver, "[s]o in order to cause liver problem[s] you have to pound to the chest not in the abdomen." As such, Dr. Bao did not believe a punch or blunt trauma to the abdomen would cause a liver laceration. Dr. Bao also testified that no rib fractures or contusions to the chest or abdomen area were contained in the materials on review. After reviewing the tissue slides, Dr. Bao believed I.H. died of viral pneumonia, viral bronchitis, and myocarditis, based on the presence of lymphocytes, or white blood cells, and viral infected cells in her lungs.

¶ 24    Dr. Bao testified that I.H. had blood in her abdomen from a laceration of the liver caused from CPR. He concluded that the large amount of blood from the liver laceration would have accumulated in I.H.'s abdomen in a few minutes. Because I.H. lost more than 50% of her blood, Dr. Bao concluded that "[t]here [wa]s no way she c[ould] survive more than one hour" if she was struck in the abdomen, stating his belief that the blood accumulated in her abdomen in 10 to 20 minutes, not over the course of several days. As such, he did not believe that I.H. was struck in the abdomen days before her death, stating, "It never happened. It cannot be happening." Dr. Bao acknowledged that he did not mention the scars and marks on I.H.'s body, stating the scars were irrelevant to the cause of death, which the defense hired him to determine. Dr. Bao testified that nothing concerned him when he reviewed the autopsy reports, records, and tissue slides with regard to the scars or markings documented on I.H.'s body by Dr. Denton. Dr. Bao testified that

11

the scars were all consistent with I.H. having a skin infection. Dr. Bao testified "[t]here [wa]s no blunt trauma anywhere."

¶ 25    On cross-examination, Dr. Bao testified that medical professionals performed CPR on I.H. when she arrived at the ER because I.H. was dead due to pneumonia, bronchitis, and myocarditis. Dr. Bao confirmed that the administration of CPR did not cause her death because she was dead when she arrived. According to Dr. Bao, it was possible that I.H. bled over 50% of her blood after she died in "[m]aybe 10 minutes." Dr. Bao next testified that I.H. "[m]ost likely" had sickle cell disease, given that 12% of the African American population have the sickle cell gene. When explaining his belief that Dr. Denton failed to compare the sizes of the spleen and kidney, the State interjected and asked Dr. Bao if he was familiar with a diagnostic manual called Pediatric Pathology, the "bible for forensic pathology for children." Dr. Bao stated, "Yes," acknowledging his familiarity with the manual. The State then read that the manual stated that "a rapid enlargement of the spleen is correlated with sickle cell and not atrophied spleen like you *** testified to?" Dr. Bao testified that the manual "was wrong," stating that in the beginning of sickle cell disease, "trap[ped] red cells can cause splenomegaly big, but eventually the spleen tissue will die and then atrophy." Dr. Bao acknowledged that he had not read the article the State referenced. Defense counsel did not object to the State's questioning, and the State did not seek to admit the manual into evidence. The State then asked Dr. Bao the following:

> "Q. So if Dr. Nelson, the emergency room doctor who treated [I.H.], who has reviewed all of [I.H.'s] pediatrics testified yesterday that she did not have sickle cell, would that change your opinions in this case?
> A. No, it would not change. It's my pathological diagnosis. As a matter of fact, in the hospital[,] the pathologist do[es] all the diagnosis. The pediatrician treat[s] the disease. We do the diagnosis. ***"

¶ 26    Next, the State asked Dr. Bao about his past employment as the associate medical examiner in Florida. Dr. Bao stated that he performed Trayvon Martin's autopsy but was subsequently fired.

12

Dr. Bao confirmed that his termination was public, resulting in multiple written articles. The following colloquy took place between the State and Dr. Bao:

"Q. *** You can find [the articles] all over the internet, on CNN and everything else, correct?
A. Yes.

* * *

Q. You were fired because you testified differently than the reports you provided to the Court, the prosecution, and the defense; is that correct?
A. That's fake news. First, the case was ten years ago. It has nothing to do with this case. You brought up that stuff just to say I'm the bad pathologist.
Q. It goes to your credibility, does it not, you've changed your testimony in court.
A. No.
Q. You are accused of lying to the Court in that case.
A. Okay. I can tell you that I'm much better than ten years ago. I'm a much better pathologist than Dr. Denton in autopsies, in the diagnosis of disease, I'm pretty sure about that, so you can stop right there.
Q. You changed your testimony in court and you got fired?
A. No, I did not. It's fake news. I told you it's fake news.
Q. After it was done, you actually sued the state's attorney's office not for wrongful termination or anything due to your employment, you sued them saying they threw the George Zimmerman case for a hundred million dollars; is that correct?"

Dr. Bao stated that he eventually dropped the suit against the State but admitted to writing a book. Dr. Bao admitted that he performed half as many autopsies as Dr. Denton. Defense counsel did not object to the State's questioning regarding Dr. Bao's employment history.

¶ 27       Next, the State asked Dr. Bao if he was familiar with a study and journal article contained in the American Journal of Forensic Medicine concerning whether resuscitation-related injuries kill infants and children. Dr. Bao testified in the negative. Dr. Bao testified that it would not surprise him that the study revealed that out of 164 child deaths where CPR was performed no children died of CPR-related injuries. Defense counsel did not object to the State's questioning, and the State did not seek to admit the journal article into evidence. Dr. Bao clarified that I.H. did not die of CPR-related injuries. Rather, Dr. Bao stated that the hospital failed I.H. by failing to make a diagnosis of sickle cell disease. Despite the State informing Dr. Bao that I.H. had not seen

13

a doctor in person since she was nine months old, Dr. Bao stated that his opinion would not change that that hospital failed her, and Dr. Nelson was incorrect to state that a punch to the abdomen caused I.H.'s death. Dr. Bao testified that he reviewed the tissue slides of I.H.'s lungs, concluding that she died from pneumonia, bronchitis, and myocarditis based on the pattern of the tissue under a microscope. Again, Dr. Bao testified that he did not perform a test to confirm that I.H. had sickle cell disease.

¶ 28    On redirect examination, Dr. Bao testified that CPR did not cause I.H.'s death but he was "a hundred percent sure [the CPR] caused the liver laceration," which caused I.H.'s internal bleeding. Defense counsel then made a renewed oral motion for a directed verdict, which the trial court denied.

¶ 29    Next, over defense counsel's objection, the State called Dr. Denton as a rebuttal witness. Dr. Denton testified that, after physically examining I.H.'s body and spleen, as well as the tissue slides of the blood clot, he did not believe I.H. had sickle cell disease. Dr. Denton testified that, contrary to Dr. Bao's opinion, I.H.'s spleen would have been enlarged if she had sickle cell disease. He denied that her spleen was enlarged. As such, Dr. Denton disagreed with Dr. Bao's opinion that I.H. had sickle cell disease.

¶ 30    As it related to I.H.'s cause of death, Dr. Denton testified that I.H. had "older pneumonia that had healed." Dr. Denton confirmed that none of the tissue slides showed inflammation or white blood cells and I.H.'s airways were open. Dr. Denton further saw no evidence of bronchitis or myocarditis or inflammation of her heart. Dr. Denton testified that I.H. "had tenting of her skin" and her lips were cracked, so "[s]he was not over-hydrated by any means." He further testified that I.H. did not have water in her stomach or small intestines, and she had no urine in her bladder. Dr. Denton, thus, disagreed that I.H. was overhydrated. Dr. Denton maintained his opinion that I.H.

died from hemoperitoneum due to a liver laceration and contusion due to blunt force trauma to the abdomen.

¶ 31 Dr. Denton, again, disagreed that CPR caused the liver laceration, explaining that the tear in her liver was small, "[s]o the blood is going to seep slowly from the tear and that's what I saw when I opened her abdomen." As such, Dr. Denton "very much disagree[d]" that the small tear in her liver caused I.H.'s "entire blood volume" to fill into her abdomen in 10 minutes or even an hour. In Dr. Denton's opinion, she bled for days from the liver laceration into her abdomen. Dr. Denton testified:

> "And, you know, also the whole literature of CPR causing death in children, it doesn't happen. I mean there's been multiple studies. You know, if you are going to see a liver laceration, it's usually an adult. It's not—You are not going to see that in children."

Moreover, Dr. Denton disagreed that I.H.'s blood clotting in her abdomen occurred postmortem. Dr. Denton stated that he had never seen a liver laceration in CPR, and even that aside, if I.H. suffered any injury causing a liver laceration while at the hospital, she would not have presented to the ER in the manner in which she arrived.

¶ 32 On cross-examination, Dr. Denton confirmed that it "would take days for that liver laceration to cause [I.H.'s] death which it did in [his] opinion." Dr. Denton stated that the abdomen of I.H. had both fresh blood and clotted blood, which included postmortem clotting. Dr. Denton testified that, according to scientific case reports in forensic pathology, CPR-related liver lacerations do not occur in children. Dr. Denton, again, testified that no evidence of sickle cell disease existed in I.H., stating: "I'm not going to test for a disease that wasn't there." Dr. Denton also stated that children often have rashes and skin infections, but I.H. had scars on her body.

15

¶ 33    Following the close of evidence and closing arguments, the trial court found defendant not guilty on count I of first degree murder but guilty on count II of first degree murder, which alleged that defendant, without lawful justification, struck I.H., knowing such acts created a strong probability of death or great bodily harm, thereby causing I.H.'s death. Defendant subsequently filed a motion to vacate, or in the alternative, motion for a new trial.

¶ 34    On January 26, 2024, the trial court held a hearing on defendant's posttrial motion and his sentencing hearing. Following arguments, the court denied defendant's posttrial motion. After considering the 110-page presentence investigation report, the testimony presented at defendant's bench trial, the factors in mitigation and aggravation, and defendant's statement in allocution, the court sentenced defendant to 50 years in prison followed by 3 years of MSR.

¶ 35    On January 29, 2024, defendant filed a motion to reconsider sentence, which the trial court denied on February 13, 2024. Defendant filed a timely notice of appeal.

¶ 36                                  II. Analysis

¶ 37    Defendant argues on appeal that the State unfairly disparaged Dr. Bao on cross-examination by purporting to use scientific evidence to impeach Dr. Bao without establishing proper foundation, mischaracterizing the testimony of Dr. Nelson, and injecting irrelevant and unsupported insinuations about Dr. Bao's prior professional history. Defendant concedes that defense counsel did not object to the State's questioning of Dr. Bao at trial and did not argue these issues in a posttrial motion. As such, defendant forfeited review of these issues. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, a defendant must both object at trial and specifically include the objection in a posttrial motion). Nevertheless, he asks this court to review his contentions under the first prong of the plain-error doctrine.

16

¶ 38    Forfeiture is a limitation on the parties and not the reviewing court. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. First-prong plain-error review is appropriate when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). The plain-error rule is not a "general savings clause" (*People v. Precup*, 73 Ill. 2d 7, 16 (1978)), but instead provides "a narrow exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process." *People v. Moon*, 2022 IL 125959, ¶ 21. Importantly, the defendant bears the burden of persuasion. *Herron*, 215 Ill. 2d at 187.

¶ 39    The first step in the plain-error analysis is to determine whether an error occurred; however, that is merely a matter of convention, and we may begin the analysis in any order. *People v. Dillard*, 2025 IL App (4th) 230739, ¶ 124. "[E]rrors reviewable under the first prong of the plain-error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *People v. Jackson*, 2022 IL 127256, ¶ 23.

¶ 40    Defendant raises three contentions on appeal. First, he argues that the State improperly cross-examined Dr. Bao by attacking Dr. Bao's testimony with medical studies not introduced into evidence, including the Pediatric Pathology and the American Journal of Medicine. He also asserts that the State failed to lay the requisite foundation when it referenced these medical texts in an attempt to undermine Dr. Bao's opinion concerning I.H.'s cause of death. Next, defendant contends that the State mischaracterized Dr. Nelson's testimony that he made a diagnosis that I.H. did not have sickle cell disease. Lastly, defendant argues that the State, in an effort to undermine

17

his qualifications and credibility in the instant case, conducted irrelevant cross-examination of Dr. Bao regarding an unrelated case and his subsequent public termination following that case.

¶ 41     As stated above, under the first prong of plain-error review, the defendant must show first that an error occurred, and second, that the evidence was so closely balanced that the "error" alone threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 565. We note, again, that this court may begin the analysis in any order. Because we find the evidence in this case was overwhelming against defendant, we need not address whether error occurred concerning defendant's three contentions. The State's theory of the case was that defendant struck I.H., causing blunt force trauma to her abdomen, which resulted in a fatal liver laceration and extensive internal bleeding. The defense's theory was that the evidence did not demonstrate that defendant struck I.H. with great probability that she would die, but that her liver laceration resulted from a CPR-related injury and that she ultimately died of viral pneumonia, viral bronchitis, and myocarditis.

¶ 42     The evidence at trial demonstrated that I.H., defendant's three-year-old daughter, died on June 22, 2022, shortly after she arrived at the emergency room critically ill and unresponsive to verbal or tactile stimuli. Dr. Denton, the forensic pathologist who performed I.H.'s autopsy, described I.H.'s blood in her abdomen as older, "stringy blood" that had been clotting for several hours to a couple of days. In addition, I.H. had almost no blood in her blood vessels, demonstrating chronic—not acute—internal bleeding. As such, after Dr. Denton's examination of I.H., he opined that her internal bleeding did not result from a CPR-related injury. Moreover, Dr. Nelson, who treated I.H. at the ER, explained that I.H. presented in an abnormal state, specifically, that her blood, which appeared like a "clear serum," had no red blood cells. To explain this unusual finding, he testified that her body had time to "compensate for th[e] loss of blood," resulting in a clear

18

serum-like substance that occurred "well before [she] arrived to the ER." Dr. Nelson highlighted that this process of blood appearing clear "[wa]s not a process that t[ook] place over the course of minutes."

¶ 43    Moreover, in rejecting Dr. Bao's opinion that I.H. suffered a CPR-related liver laceration, Dr. Denton explained that the tear in I.H.'s liver was small on the underside of the liver closest to her spine. Dr. Denton believed that I.H.'s blood "seep[ed] slowly from the tear," which is "what [he] saw when [he] opened her abdomen." As such, Dr. Denton "very much disagree[d]" that the small tear in her liver caused I.H.'s "entire blood volume" to fill into her abdomen in a short period of time, as suggested by Dr. Bao. Rather, Dr. Denton explained that a tear in the posterior underside of I.H.'s liver was "consistent with an injury or basically the liver is pushed against the spine and the back of the liver tears, and it's not consistent with CPR." To further disprove Dr. Bao's opinion that I.H. suffered a CPR-related injury, Dr. Denton explained that a liver tear following CPR would occur as a result of chest compressions on the front side of the liver and much higher up on the liver. Similarly, Dr. Nelson testified that CPR would cause a laceration on the anterior or outside portion of the liver, not the posterior area of the liver. Specific to I.H., Dr. Nelson highlighted that I.H.'s laceration was in the posterior area of her liver, which, in Dr. Nelson's opinion, "just does not correlate with injury from CPR."

¶ 44    In addition, the trial court heard evidence from Dr. Denton that there was no evidence of pneumonia or bronchitis in I.H.'s lungs. Specifically, Dr. Denton testified that the pneumonia virus presents as "very firm and hard" and "a dark red," due to inflammation. Specific to I.H., her right lung was pink with no firm areas. Although her left lung was redder and had a small area of firmness, Dr. Denton opined that I.H., "at most," had old pneumonia at some point in the past. Dr.

19

Denton also testified there was no visual or microscopic bronchitis in I.H.'s lungs. Moreover, Dr. Denton testified that I.H. did not have myocarditis, or an infection of the heart, as Dr. Bao opined.

¶ 45    Moreover, Katrina testified that defendant "popped" I.H. the weekend before her death, approximately four days before she presented to the ER. According to Katrina, defendant and I.H. were on a couch in the front room, while Katrina slept with their infant child in the back bedroom. A review of Facebook messages between defendant and Katrina showed that defendant, who was alone in the front room with I.H., informed Katrina that I.H. was crying or screaming around midnight on June 18, 2022. Defendant messaged Katrina, "bout to blast peanut butter." The next day, Katrina saw I.H. on the couch. I.H. did not get off the couch that day, and it is unclear whether I.H. ever got off of the couch following defendant's indication that he was "bout to blast" I.H. Katrina, herself, testified that I.H., who usually followed her around the house, remained on the couch. Despite this, Katrina did not notice something was seriously wrong with I.H. until several days later on June 22, 2022, when Katrina viewed I.H. on the couch and felt "something wasn't right." Defendant himself appeared to express concern regarding I.H.'s condition the night before, when he messaged Katrina and asked if he should take her to the hospital.

¶ 46    Given the aforementioned facts, we cannot agree with defendant that the evidence was closely balanced simply because Dr. Bao, the defense expert witness, opined that I.H. suffered a CPR-inflicted liver laceration and died of viral pneumonia, viral bronchitis, and myocarditis. This is especially true where Dr. Bao did not personally examine I.H. or conduct her autopsy. He, instead, reviewed the reports and images taken by Dr. Denton, who testified, as stated in great detail, that Dr. Bao's opinions were not based on any evidence contained within the materials he prepared. Moreover, a very detailed review of the record demonstrates that the court heard substantial evidence over the course of three days that I.H. presented to the ER in a physical state

20

of chronic starvation, malnutrition, and severe dehydration, as well as with chronic, not acute, internal bleeding. The evidence showed that, according to her own mother, I.H. was alone with her father on June 18, 2022, at which time defendant messaged Katrina that he was "bout to blast" I.H. Katrina also admitted that defendant told her that I.H. "got up and she was screaming" so defendant "popped [her and] put her back on the couch, made her lay down." Although Katrina could not recall what day this exchange with defendant took place, Katrina admitted that I.H. did not move from the couch after defendant told her he was "bout to blast" I.H. Katrina's testimony implying that defendant hit or spanked I.H. several days before I.H. presented to the ER was consistent with Dr. Denton's medical opinion that I.H. had been bleeding internally from a liver laceration for several days.

¶ 47 Moreover, text messages from the evening of June 21, 2022, showed that defendant and Katrina understood I.H. had a serious health concern, provided defendant asked Katrina if they should bring I.H. to the hospital. It was not until June 22, 2022, several days after Katrina first noticed I.H. lethargic on the couch, that I.H.'s unresponsiveness on the couch prompted Katrina to request defendant to take her to the ER. As such, additional evidence supported Dr. Denton's opinion that I.H.'s cause of death resulted from a liver laceration and contusion from blunt trauma to her abdomen that occurred within days of her death, which was exacerbated by several other factors, including starvation and dehydration. Moreover, as Dr. Denton stated, and we agree, even if I.H. suffered an injury causing a liver laceration while at the hospital, it does not explain why she presented to the ER in an extremely lethargic, unresponsive, critically ill manner.

¶ 48 Based on the foregoing, we find defendant failed to carry his burden of establishing first-prong plain error as the evidence was not so closely balanced that the errors alone threatened to tip the scales of justice.

¶ 49                          III. Conclusion

¶ 50    For the foregoing reasons, we affirm the judgment of the Jackson County circuit court.


¶ 51    Affirmed.